JOHN W. McINTYRE & others vs. COUNTY COMMISSIONERS
OF THE COUNTY OF BRISTOL & others.[1]

Bristol.  December 2, 1969. — December 23, 1969.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, SPIEGEL, REARDON,
& QUIRICO, JJ.

*Court House.  County.  Public Officer.  Mandamus.  Pleading, Civil,
Petition.*

St. 1966, c. 393, authorizing the county commissioners of Bristol County
to construct on a site to be selected by them a new building for the
Superior Court and the Probate Court and county purposes is per-
missive. [523]
In the interest of proper judicial administration, prompt improvement in
the court house facilities in Bristol County is imperative. [524]
A demurrer properly could have been sustained to a petition for a writ
of mandamus by attorneys residing in Bristol County alleging in sub-
stance that under G. L. c. 34, §§ 3 and 14, the county commissioners
had a duty to provide suitable court houses, that the current court
house facilities were "unsuitable and inadequate," that under St. 1966,
c. 393, the commissioners were authorized to construct a new court
house, and that their failure to act thereunder was "arbitrary and
unreasonable," and praying primarily for an order directing action by
the commissioners under c. 393 rather than under G. L. c. 34, §§ 3 and
14. [525]
Upon the facts found by the trial judge in a mandamus proceeding by
attorneys residing in Bristol County for relief against unsuitability
and inadequacy of the court house facilities therein and the failure of
the county commissioners to take any step to solve the problem, which
was susceptible of reasonable solution by a variety of measures, this
court held that it was premature to grant relief by mandamus, and
ordered that a stay of execution of an order for judgment for issuance
of the writ be continued in effect and that the case be transferred to
the county court of the Supreme Judicial Court for certain further
proceedings. [526, 527]

PETITION for a writ of mandamus filed in the Superior
Court on December 3, 1968.

---

[1] The county treasurer and the interveners.

The case was heard by *Hennessey, J.*, on demurrers and on the merits.

*Talbot T. Tweedy* for certain interveners.

*Douglas Smerdon,* intervener, pro se.

*Walter J. Hurley* (*Melvin S. Louison* & *Sheldon J. Cohen* with him) for the respondents Charles A. Frates & another.

CUTTER, J. Twenty inhabitants of Bristol County, each of whom is an attorney, seek a writ of mandamus to compel the county commissioners to select a court house site, to have plans and specifications prepared, and to take other steps to "provide adequate and suitable facilities and accommodations" in that county for the Superior Court. It is alleged that the present court house facilities are inadequate, that the county commissioners are charged by G. L. c. 34, §§ 3 and 14, with a duty of providing suitable court houses, and that by St. 1966, c. 393, the county commissioners were given certain powers and authority which they have not exercised. Twelve attorneys have intervened to oppose granting relief. Certain respondents filed demurrers. Two were largely on the grounds that the petition seeks to require the. county commissioners to perform a discretionary act and fails to state grounds for judicial relief. The demurrers were overruled. After hearing evidence, taking judicial notice of specified facts, and receiving certain stipulations of fact, the trial judge made detailed findings.

The order for judgment directed the county commissioners "with all practicable speed . . . to take all steps and measures which are lawfully available to them to provide court house facilities for [the] Superior Court and [the] Probate Court which are suitable in all necessary characteristics, including but not limited to" sixteen types of facilities.[2] Execution of the order was stayed pending a

---

[2] These included adequate court rooms, judges' lobbies, jury rooms, custodial quarters, grand jury facilities, conference rooms, hearing rooms for masters and auditors, stenographers' rooms, county legal officers' quarters, waiting rooms and lavatories, parking spaces, and a library.

determination by this court, upon the trial judge's report for our review, of (a) his orders overruling the demurrers and (b) his order for judgment. Before us are the pleadings, the evidence, his written statement of the matters of which he took judicial notice, and the findings. The findings (supplemented by facts of which the judge took judicial notice) are summarized below.

Bristol County has three court houses which are used by the Superior Court. These are in Fall River, Taunton, and New Bedford. Superior Court sittings of two judges in the same court house were held in four months in 1968, all in New Bedford. In four other months, two Superior Court judges presided simultaneously over single sessions in separate court houses. In three other months, one Superior Court judge presided over a single session. Single session sittings (as compared with sessions where more than one judge is available at the same court house at the same time) cause waste and duplication (of overhead and personnel).[3] Each of the three existing court houses, and the total facilities thereby afforded are inadequate in respects described by the judge. Accommodations for the courts, court officials, jurors, lawyers, and members of the general public are unsuitable and, for the most part, out of date. Facilities for the Superior Court must be shared, in some instances, with the Probate Court, for which some of the facilities are also inadequate (including a room in a District Court house in Attleboro). Except for a new wing of the New Bedford court house built in 1953, "not even a substantial renovation of any facilities for . . . [the Superior Court] buildings has been accomplished in this century, in Bristol County."

---

[3] The findings discuss in detail the absence of "adequate facilities to permit two and more Superior Court judges to preside over sessions simultaneously in the same . . . building." The judge found that "[t]wo Superior Court judges sitting simultaneously and working cooperatively . . . can ordinarily dispose of at least 50% more court business than can the same two Superior Court judges sitting alone and separately, in two court houses, for the same period of time." He also found that, "[i]nevitably, there will be a rapidly increasing future caseload . . . in both criminal and civil matters. Adequate facilities for double and multiple simultaneous sessions in a single court house are a present necessity, and will be an increasing necessity for the future."

By St. 1966, c. 393,[4] the county commissioners "were given permission and authority to construct a new court house for [the] Superior and Probate Courts." This "legislative recognition that the court house facilities . . . [have] reached a stage of acute . . . inadequacy" has not led the county commissioners to take a "step of any kind to . . . [carry out] the legislative permission . . . [or] to build a court house ·or even to renovate . . . present facilities." Indeed, the evidence shows that on January 25, 1967, the commissioners voted that, "inasmuch as a majority . . . is now on record as . . . opposed to the construction of a centralized court house in Bristol County . . . no monies should be included in the 1967 budget for a study of court house facilities."

The trial judge correctly ruled that c. 393 "is permissive in nature and imposed no legal duty upon the . . . county commissioners." He thus placed reliance upon G. L. c. 34, § 3 (as amended through St. 1965, c. 513), which reads in part, "Each county shall provide suitable court houses, jails, houses of correction, fireproof offices and other public buildings necessary for its use, and suitable accommodations for district courts" (with exceptions not now relevant). As to § 3, he ruled that it "is mandatory in nature and imposes a legal duty upon the . . . county commissioners to pro-

---

[4] This statute is entitled "An Act authorizing the county commissioners of Bristol County to construct a new building for the courts and various departments of said county." Section 1 provides in part (emphasis supplied): "*For the purpose of providing new and adequate accommodations and facilities for the superior court, the probate court and various county departments,* the county commissioners . . . are hereby authorized to construct *on a site to be selected by the county commissioners a building* to be known as the Bristol County court house and office building, and shall furnish and equip the same. Said building shall contain court rooms and facilities for the superior court, the probate court and shall house the offices of the clerk of courts, the district attorney, the probation office, the maintenance department, the county treasurer and the county commissioners, and shall contain the law library." The commissioners are then given power to take land by eminent domain and to "expend for the purposes of this act including the preparation of plans and specifications in connection therewith and for landscaping such sums as may be necessary not exceeding, in the aggregate," $2,500,000 (including certain Federal funds). Section 2 permits the county treasurer to borrow for the purposes set out in § 1 not more than $2,500,000. Section 3 authorizes the commissioners to use for county business "all facilities vacated as the result of the removal to said building of county offices" and to sell or otherwise dispose of the vacated buildings, as more fully set out in § 3.

vide suitable court houses for the Superior and Probate Courts."

As indicated above, differing views exist concerning the relief, if any, which should be granted. The twenty original petitioners seem to request the selection of a site and the construction of a single central court house for the use of Bristol County. The interveners contend that the northern part of Bristol County is now adequately served by the court house at Taunton. They assert "that the congestion and delay in the trial of cases . . . has been caused by . . . a definite lack of a sufficient number of Superior Court judges to handle the increased volume of . . . cases." The intervening respondents and two of the county commissioners assert in their demurrers and answers somewhat varying grounds for the denial of relief. These two county commissioners, among other things, state "that the proposed facilities cannot be acquired, built, and equipped for $2,500,000," a matter on which no substantial evidence was offered.

The order for judgment does not direct the county commissioners to make any particular decision. It commands them merely, apparently pursuant to G. L. c. 34, § 3, to "provide [suitable] court house facilities." In his preliminary findings, the judge had defined "[s]uitable" court house facilities as "those which provide the minimum necessities for speedy . . . and efficient disposition of court business . . . [and] to maintain public respect for the dignity and stature of the Superior and Probate courts." His order pointed out specific respects in which the facilities should be "suitable" but did not direct the provision of any particular facilities.

We think that the judge's conclusions are abundantly justified by the record. We have no doubt that, in the interest of proper judicial administration, prompt improvement of the court house facilities in Bristol County is imperative in respects specified by the trial judge. The question before us, however, is whether relief can, or should, now be afforded by mandamus.     .   .    .    ..

1. We deal first with the demurrers. The petition

asserts only (a) the duty of the county commissioners under
G. L. c. 34, §§ 3 and 14; (b) the bare conclusion that
present facilities "are unsuitable and inadequate"; and
(c) the existence of St. 1966, c. 393, and the county com-
missioners' "arbitrary and unreasonable" failure to act
under it. These allegations provide an unsatisfactory
basis for action by mandamus. The acts which the county
commissioners are asked to carry out are not adequately
specified in the petition. Indeed, it appears from St. 1966,
c. 393, that there exists a wide range of permissible and
largely discretionary action open to the county commis-
sioners under that statute or (under G. L. c. 34, §§ 3, 14)
by way of improvement and renovation of existing facilities.
The demurrers could properly have been sustained. See e.g.
*Nason* v. *Commissioner of Mental Health,* 351 Mass. 94,
96–98, and cases cited. Particularly is this so, because the
prayers for relief in the petition appear primarily to seek
permissive action under the 1966 statute rather than to ask
that the commissioners be commanded to move to perform
their statutory duties under G. L. c. 34, §§ 3 and 14. There
is here no such failure to perform a specific public trust or
duty as was considered in *Nickols* v. *Commissioners of
Middlesex County,* 341 Mass. 13, 27. We recognize that, in
some earlier cases, mandamus has been employed to re-
quire the execution of somewhat general statutory duties.
See e.g. *Commonwealth* v. *Justices of the Court of Sessions of
Hampden,* 2 Pick. 414, 418–419. See also *Attorney Gen.* v.
*Boston,* 123 Mass. 460, 471–472; *Nason* v. *Commissioner of
Mental Health,* 351 Mass. 94, 97. On the allegations before
us, however, the duty enforcement of which is sought is not
suitably stated in definite terms.

2. Because the case has been tried on the merits and
argued by certain parties, we deal with it on a broader
basis than the demurrers. The problem relates to matters
of judicial administration with which this court is much
concerned, and with respect to which, within appropriate
limits, we may afford certain relief. See e.g. *County Commrs.
of Bristol* v. *Judges of Probate of Bristol,* 338 Mass. 738,

739–742. See also G. L. c. 211, § 3 (as amended by St. 1956, c. 707, § 1); § 3C [5] (as inserted by St. 1956, c. 707, § 2).

We think that, even upon the facts found by the trial judge, it is premature to grant relief by mandamus in an attempt to solve this problem, susceptible of reasonable solution by a variety of measures. It may well be (a) that the expenditure authorized is insufficient to permit the best solution in the light of present and probable future needs, and (b) that certain solutions may be too costly. Presumably, some degree of public unanimity, especially on the part of the bar, concerning the proper solution might assist the county commissioners to determine whether to construct a new court house under the 1966 statute or to formulate an adequate program of improvement of one or more of the existing court houses. Additional legislation may be essential or appropriate.

The command to the county commissioners in the order for judgment to make and carry out a decision doubtless was made upon the basis of the finding that the county "commissioners have taken to date, no step" to carry out the 1966 statutory permission to proceed. It, of course, is the duty of the county commissioners under G. L. c. 34, § 3, promptly to consider and decide what can be done to cure the present deficiencies in the court house situation, and to take all reasonable steps to provide suitable facilities. Nevertheless, we are reluctant to assume that the county commissioners will not now proceed to do all in their power to meet their responsibility with respect to the serious matters pointed out to them in the findings of the trial judge. See *Nason* v. *Superintendent of Bridgewater State Hosp.* 353 Mass. 604, 613, and cases cited. In doing this, they should have the coöperation and assistance of the bar and

---

[5] The present Executive Secretary of this court was a witness in the proceedings before the trial judge. He and each of his predecessors have expressed serious concern about the inadequacy of Bristol County court house facilities. See Report of the Executive Secretary to the Justices, Pub. Doc. No. 166, for the following years: 1957, p. 16 (describing Bristol County court facilities as the "worst in the state"); 1963, p. 21; 1966, pp. 24–25; 1967, pp. 20–21; 1968, p. 30.

of interested bar associations. If the Executive Secretary (see fn. 5), can be of assistance to the bar, bar associations, and the commissioners in reaching agreement concerning the proper solution, that assistance obviously will be readily available.

3. The stay of execution of the order for judgment is continued in effect. The case is to be transferred from the Superior Court to the county court under G. L. c. 211, § 4A (as inserted by St. 1962, c. 722, § 2), for further proceedings consistent with this opinion, which may include vacating the order for judgment if and when that may become appropriate, amendment of the pleadings, and further hearings and orders, if the county commissioners fail to take appropriate and adequate action within a reasonable time.

*So ordered.*